# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| 500 NORTH AVENUE LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 3:10cv1281 (MRK) |
| | : | |
| CITY OF BRIDGEPORT, DENNIS | : | |
| BUCKELY, BRIDGEPORT PLANNING | : | |
| and ZONING COMMISSION, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

Plaintiff 500 North Avenue, LLC ("500") brings suit against Defendants City of Bridgeport, Connecticut; Dennis Buckley in his official capacity as Zoning Official for the City of Bridgeport; and the Bridgeport Planning and Zoning Commission (collectively "Bridgeport") under 42 U.S.C. § 1983 alleging violations of the First and Fourteenth Amendments. *See* Complaint [doc. # 1]. Specially, 500 alleges that Bridgeport's zoning regulations constitute prohibited content-based regulations and unconstitutional prior restraints.[1] After careful review of the arguments and evidence, the Court grants in part and denies in part 500's Motion for Partial Summary Judgment [doc. # 48].

The Court finds that the requirements in § 6.6.1 and Table 2.A of the Bridgeport Zoning Regulations are unconstitutional. As they were adopted without sufficient pre-enactment evidence of secondary effects, Bridgeport has failed to demonstrate that its regulations limiting adult entertainment facilities to MU-LI zones serve a substantial governmental interest. The

---

[1] While only the constitutional claims are currently before the court with regard to the pending motion, *see* Pl.'s Mot. for Partial Summ. J. [doc. # 48], 500's Complaint [doc. # 1] also requests that this Court review the Bridgeport Planning and Zoning Commission's July 26, 2010 decision.

Court therefore enjoins Bridgeport from enforcing these provisions against it. As a result, the Court need not address the question of whether § 6.6.1 and Table 2A fail to provide for alternative avenues of communication or are overbroad. However, recognizing the potentially disruptive effect of its decision, the Court stays the entry of its judgment for 90 days to allow the Commission to revaluate and possibly readopt, after considering secondary effects, its regulations regarding adult entertainment facilities. Finally, the Court finds that there remains a genuine issue of material fact as to whether the regulations regarding applications for floating districts or Special Permits are sufficiently limited by judicial, administrative, or practice-based constructions so as not to permit constrained official discretion. *See* Fed. R. Civ. P. 56.

## I.

These facts are culled from the parties' Local Rule 56(a) Statements [docs. # 49, 52, 58, 59, 62], Bridgeport's Response to Discovery Questions [doc. # 91], and the parties' Joint Amendment to Bridgeport's Response [doc. # 92], affidavits, and exhibits. All of the facts recited below are undisputed unless otherwise noted, and the Court presents all facts "in the light most favorable to the nonmoving party"—here, Bridgeport—after drawing "all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted). Additional facts are discussed in the analysis where relevant.

## A.

500 is the owner of real estate in Bridgeport's Mixed Use Light Industrial ("MU-LI") Zoning District. It wants to open a restaurant which includes live entertainment, featuring topless or nude female performers. Such a facility would be classified as an "adult entertainment facility" under the regulations and would be considered either an "adult cabaret," "adult theater,"

or a "bar featuring 'topless' or 'exotic' dancers and strip-tease performances." Per § 6.6.1 and Table 2.A of the regulations, 500's proposed entertainment use is not allowed as a matter of right on any property within Bridgeport—such a business is allowed only in Heavy Industrial (H-I) zones, and only then if it obtains a Special Permit in accordance with § 14-4 of the regulations.

Bridgeport maintains that there are fifteen locations in Bridgeport that have been grandfathered in to allow non-conforming uses with respect to the operation of adult entertainment facilities. The buyer of such a business can operate an adult entertainment facility in its current location. Bridgeport further maintains that there are locations within Bridgeport—presumably in H-I zones—where the current regulations would not bar an adult entertainment facility if the applicant obtained a Special Permit.

The parties agree that, should 500 succeed in having the regulations regarding adult entertainment facilities struck down as unconstitutional, 500's proposed entertainment would fall into the "Entertainment, restaurant, or recreation trade" category. It would then be permitted to open its proposed business in a MU-LI zone (and all other zones where live entertainment is permitted) if it first obtains a Special Permit.

Live entertainment is allowed as a matter of right only in a Mixed Use Waterfront ("MU-W") zone or in a Planned Development District ("PDD"). Both MU-W zones and PDDs are "floating districts"—that is, other eligible parcels must be re-zoned as such, then an applicant must obtain General Development Plan ("GDP") and Detailed Development Plan ("DDP") approval from the Commission. Such approvals are subject to the Commission's findings in §§ 14-5 and 14-6-4d of the regulations.

For most other zones, a proposed "Entertainment, restaurant, or recreation trade" business may operate after obtaining a Special Permit. Section 14-4 *et seq.* of the regulations provides the

standards and procedures associated with obtaining a Special Permit. The parties agree that the Commission may exercise discretion in making findings required for a Special Permit in the granting or denial of an application.

## B.

A complete revision of the Bridgeport Zoning Regulations ("regulations") took place in 1996. Before this revision, the regulations did not include any restrictions relating to adult entertainment facilities. The revisions resulted in codified restrictions on such facilities.

500 alleges that the Bridgeport Planning and Zoning Commission ("Commission") as a whole did not discuss or review the issue of "adverse secondary effects" relating to adult businesses during the 1996 revisions. Bridgeport notes that this statement cannot be affirmed or denied—rather, all that is currently known is that Lynn M. Haig, a Senior Planner for the City of Bridgeport, did not find any evidence that the issue of adverse secondary effects was discussed or reviewed by the Commission in adopting the 1996 regulations.

## C.

In 2004, the Commission considered amendments to the regulations, including amendments to the provisions of the regulations dealing with adult entertainment facilities. During this review, the Commission was presented with evidence of the negative secondary effects of such facilities, in the form of a packet of materials submitted in advance of a meeting scheduled for July 19, 2004. This packet was delivered to the Commissioners' homes on approximately July 9, 2004, and the Zoning Department of Bridgeport retains a copy of this packet on file in its offices.

The evidence presented in 2004 included studies of the negative secondary effects of adult entertainment facilities that were carried out in other cities, which included but were not limited to decreases in property values and increases in violent crime, car vandalism, prostitution, excessive lighting, economic loss to other businesses through customer deterrence, as well as parking problems.

The Commission rejected the amendments to the regulations dealing with adult entertainment facilities. The 1996 regulations therefore remained in full force and effect.

D.

The Commission commenced a partial re-write of the regulations in 2008, which were adopted in 2009 and took effect on January 1, 2010. The changes made between the 1996 and 2010 versions of the regulations in the language defining "adult entertainment facilities" was minor: it was "just an update to acknowledge the new forms of transmission, electronic devices, . . . just an updating to reflect technology advances." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. K at 24 (Deposition of Linda M. Haig). Specifically, the Commission added "Four digital video discs," "or other forms of electronic media," and "video stores" to § 6.6.1 of the regulations. *Id.*

The parties agree that, during the 2008/2009 revision, no discussions were held or pre-enactment evidence presented to the Commission as a whole as to whether or not "Adult Entertainment Facilities," as defined in the regulations, caused adverse secondary effects. Furthermore, there was no discussion at all by the Commission as a whole on the subject of "adult entertainment" or "adult entertainment facilities."

There were many changes in the composition of the Commission between July 2004 and 2009. Barbara Freddino, Mel Riley, Carl Kish, Patricia Fardy, and Alan Kennedy were members

of the Commission during both the 2004 and the 2008/2009 revisions, although Ms. Fardy and Mr. Kennedy were no longer Board Members at the time of the November 30, 2009 vote on the 2008/2009 amendments. There were at least seven members of the Commission—comprising a majority—during the 2008/2009 process who were not members during the 2004 revision process: Reginald Walker, John Kenyhercz, Thomas Fedele, Anne Pappas Phillips, Gail Soltis, Jose Tiago, and Robert Morton.

Materials and findings from the 2004 process were not submitted to the Commission in 2008/2009. However, at least one member of the Commission, Ms. Freddino, recalled the evidence of the negative secondary effects of adult entertainment facilities that was presented in 2004 during the 2008/2009 rewrite of the regulations. Ms. Freddino made at least one statement that, in 2004, the Commission was given information as to the secondary effects of adult entertainment facilities. Ms. Freddino's comment was not made to the Commission as a body, but rather was made to those sitting near her at a meeting of a re-write committee which was involved in a review of the regulations during the 2008/2009 process. The parties agree that no specific evidence, including studies, was provided to either the committee or the Commission during the 2008/2009 revision process.

Section 13.4.4 of the 2010 regulations provides that a violation of any zoning regulation subjects the violator to fines and injunctive procedures. The parties do not dispute that no adult entertainment facility has submitted an application for a Special Permit in a permitted zone submitted to the Commission, and therefore that the Commission has never rejected any such applicant.

## II.

This Court applies a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). A "material fact" is one whose resolution will affect the ultimate determination of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See id.*; *see also Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub*, 202 F.3d at 178 (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," and instead "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986) (quotation marks omitted) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.

Courts must balance protecting society's interest in permitting all forms of expression with a city's interests in reducing crime and other serious problems. These competing interests come into conflict when zoning regulations hinder someone who wishes to operate an adult

business. The rights of the would-be strip-club owner and the zoning regulators, who represent the interests of other residents, are each acknowledged but nonetheless circumscribed by the rights of the other.

"[T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect. Moreover, the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976). "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 68 (1981). However, "the zoning power is not infinite and unchallengeable; it must be exercised within constitutional limits." *Id.* (quotation marks omitted).

While obscene material is not protected by the First Amendment, "[n]udity alone does not place otherwise protected material outside the mantle of the First Amendment. Furthermore, . . . nude dancing is not without its First Amendment protections from official regulation." *Schad*, 452 U.S. at 66 (alteration, citations, and quotation marks omitted); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 753 (2d Cir. 1998) ("Nonobscene nude dancing performed as entertainment has expressive content that is protected by the First Amendment."). However, while

> the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . .

*Young*, 427 U.S. at 70; *see also White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 169 (2d Cir. 2007) ("Although nudity is not an inherently expressive condition, 'nude dancing of the type at issue here is expressive conduct . . . [that] falls only within the outer ambit

of the First Amendment's protection.'" (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000))).

The Second Circuit reads Supreme Court case law as permitting local governments to "limit the location of adult entertainment establishments in order 'to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, but not to suppress the expression of unpopular views.'" *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 21 (2d Cir. 2010) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)) (alteration omitted). However, "when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Schad*, 452 U.S. at 68.

## IV.

It has long been established that "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." *Renton*, 475 U.S. at 46-47. "On the other hand, so-called 'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.* at 47.

The inquiry as to whether zoning regulations are unconstitutional is therefore split into two analyses: whether they are content-neutral and whether they are justified.

> The former requires courts to verify that the predominate concerns motivating the ordinance were with the secondary effects of adult speech, and not with the content of adult speech. The latter inquiry goes one step further and asks whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance.

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440-41 (2002) (quotation marks, citations, and alterations omitted).

Here, the Court can assume that the regulations have "not violated whatever content-neutrality requirement may apply to adult entertainment zoning ordinances," *TJS*, 598 F.3d at 22 n.5, because, for reasons that will follow, it finds that Bridgeport cannot demonstrate that the regulations were " designed to serve a substantial governmental interest." *Renton*, 475 U.S. at 47.

"[T]o demonstrate that an ordinance furthers a substantial government interest, a municipality must show that in enacting the legislation, it relied on some evidence 'reasonably believed to be relevant' to the problem of negative secondary effects." *White River*, 481 F.3d at 171 (quoting *Renton*, 475 U.S. at 51). In other words, "[a] city must provide some evidence of a connection between 'the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance.'" *Id.* at 171 (quoting *Alameda Books*, 535 U.S. at 441). "However, a city need not prove that such a link exists or prove that the ordinance will be effective in suppressing secondary effects." *Id.* at 171; *see also Alameda Books*, 535 U.S. at 439-40 ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously.").

The burden of proof first lies with the municipality, but it shifts throughout the analysis:

> The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books*, 535 U.S. at 438-39. Although a city "bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects, it does not bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments that is inconsistent with its own." *Id.* at 437. Furthermore, although "*Renton* does not set 'a high bar' for municipalities, . . . a municipality cannot 'get away with shoddy data or reasoning.'" *White River*, 481 F.3d at 170 (quoting *Alameda Books*, 535 U.S. at 438). Furthermore, a municipality "may not simply rely on the fact that other municipalities have enacted such ordinances and that they have been upheld." *Id.* at 172 (citing *Renton*, 475 U.S. at 50-51). Finally, the Second Circuit reads *Renton* as requiring municipalities to support their burden with pre-enactment evidence of secondary effects; in *White River*, the panel did not take post-enactment justifications into consideration. *See id.* at 171 ("Although the Supreme Court has not expressly decided the issue, the *Renton* standard suggests that pre-enactment evidence is necessary . . . .").

### A.

As this case turns in part on whether Bridgeport has borne its burden of proof, the Court briefly reviews relevant cases for guidance on this issue.

In *Young*, 427 U.S. 50, the Supreme Court's standard for the municipality's burden of proof was fairly permissive. The *Young* Court merely noted that,

> [i]n the opinion of urban planners and real estate experts who supported the ordinances, the location of several such businesses in the same neighborhood tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere.

*Id.* at 54.

In *Schad*, 452 U.S. 61, however, the Supreme Court faulted a municipality for presenting no evidence that "live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment." *Id.* at 73. The *Schad* Court further observed that a connection between adult entertainment facilities and negative secondary effects was "not immediately apparent as a matter of experience."[2] *Id.*

In *Renton*, 475 U.S. 41, the Supreme Court found that holding public hearings, reviewing the experiences of other cities (including dissimilar cities), and receiving a report from the City's Attorney's Office regarding developments in other cities was sufficient to meet the burden of proof. *See id.* at 44. The Court explicitly found that the First Amendment "does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51-52. It was apparently irrelevant that the city "conducted no studies, and heard no expert testimony, on how the protected uses would be affected by the presence of an adult movie theater, and never considered whether residents' concerns could be met by restrictions that are less intrusive on protected forms of expression." *Id.* at 60 (Brennan, J., dissenting) (quotation marks omitted).

In *Alameda Books*, 535 U.S. 425, the Supreme Court held that a city "may reasonably rely on a study it conducted some years before enacting the present version of [an ordinance] to

---

[2] Supreme Court Justices have since disagreed over whether it is generally accepted that high concentrations of adult businesses produce negative secondary effects. *Compare Alameda Books* at 444 ("Municipal governments know that high concentrations of adult businesses can damage the value and the integrity of a neighborhood.") (Kennedy, J., concurring), *with id.* at 459 ("[W]e must be careful about substituting common assumptions for evidence, when the evidence is as readily available as public statistics and municipal property valuations, lest we find out when the evidence is gathered that the assumptions are highly debatable.") (Souter, J., dissenting).

demonstrate that its ban on multiple-use adult establishments serves its interest in reducing crime." *Id.* at 430.

In *White River*, 481 F.3d 163, the Second Circuit found that (1) reviewing other public indecency ordinances and two letters noting that courts had upheld a similar ordinance; (2) holding two meetings to discuss the ordinance; and (3) the fact that one or two members of the Selectboard discussed negative secondary effects with constituents was "insufficient to meet defendant's burden under *Renton*." *Id.* at 172. Reading *Renton* narrowly, the Second Circuit noted, "While a municipality may rely on the studies conducted by other towns, it may not simply rely on its knowledge that such studies exist." *Id.* Additionally,

> The only indication that the Selectboard may have relied on evidence of the potential for negative secondary effects is the fact that one or two members of the Selectboard discussed such issues with some constituents. . . . Even if we were to find such evidence sufficient to meet the *Renton* standard, *there is no indication that the Selectboard as a whole relied on this evidence.* Thus, at most, this evidence establishes that two of the five Selectboard members—and not the Selectboard as a whole—may have relied on some evidence regarding secondary effects when enacting the Ordinance.

*Id.* at 173 (emphasis added).

### B.

When § 6.6.1 and Table 2.A, the regulations regarding adult entertainment facilities, were first enacted in 1996, there is no indication that the Commission considered evidence of secondary effects. Therefore, the 1996 regulations were unjustified. *See, e.g.*, *Schad*, 452 U.S. at 73.

In 2004, when the Commission considered amendments to the regulations dealing with adult entertainment facilities, the Commission was presented with evidence of the negative secondary effects of such facilities, in the form of a packet of materials submitted in advance of a

meeting scheduled for July 19, 2004. The evidence presented in 2004 included studies of the negative secondary effects of adult entertainment facilities that were carried out in other cities, which included but were not limited to decreases in property values and increases in violent crime, car vandalism, prostitution, excessive lighting, economic loss to other businesses through customer deterrence, as well as parking problems. Had the Commission amended or readopted the regulations in 2004, it is likely that the resulting regulations would be justified. *See, e.g.*, *Renton*, 475 U.S. at 51-52. However, the 2004 Commission took neither of these actions, leaving the unjustified 1996 regulations in place.[3]

After the 2008/2009 revision process, the Commission adopted minor amendments to the 1996 regulations governing adult entertainment facilities. The parties agree that there is no evidence that the Commission as a whole considered evidence of secondary effects during this process. Bridgeport nonetheless argues that there is a question of material fact as to whether the Commission considered evidence of secondary effects. It bases its argument on the facts that information was considered by a Commission subcommittee and the Commission as a whole in 2004, that Ms. Freddino recalled those discussions, and some members of the Commission during the 2004 discussions were also members of the Commission during the 2008/2009 revision process.

The Court disagrees. Even if Ms. Freddino alerted the Commission (and not just those sitting near her in the subcommittee) that "'relevant evidence' existed somewhere, the [Commission] did not actually review such evidence." *White River*, 481 F.3d at 172. Similarly, the fact that other individuals—Mr. Riley, Mr. Kish, Ms. Fardy, and Mr. Kennedy—were members of the Commission in 2004 when secondary effects were discussed and during the

---

[3] The parties do not argue, and so the Court need not evaluate, the thorny question of whether the Commission's failure to amend the regulations regarding adult entertainment facilities in 2004 constituted an adoption of the 1996 text after consideration of evidence of secondary effects.

2008/2009 amendment process shows nothing about whether the Commission *as a whole* relied on such evidence when enacting the 2008/2009 amendments. *See id.* at 173. As Bridgeport can offer no proof that the 1996 or 2008/2009 Commission considered "evidence that supports a link between concentrations of adult operations and asserted secondary effects," Bridgeport has failed to carry its burden of proof. *Alameda Books*, 535 U.S. at 437.

Although "[m]unicipalities will, in general, have greater experience with and understanding of the secondary effects that follow certain protected speech than will the courts," *id.* at 442, in this case Court finds that Bridgeport has failed to demonstrate that its regulations limiting adult entertainment facilities to MU-LI zones serve a substantial governmental interest. *See Renton*, 475 U.S. at 47; *White River*, 481 F.3d at 171. Accordingly, the Court finds that § 6.6.1 and Table 2.A of the regulations are unconstitutional.

The parties agree that, should 500 successfully demonstrate that the regulations regarding adult entertainment facilities are unconstitutional, § 6.6.1 and Table 2.A of the regulations as currently written may not be enforced against 500—and, presumably, against other operators of adult entertainment facilities. As the Court has found the regulations unconstitutional, the Court enjoins Bridgeport from enforcing § 6.6.1 and Table 2.A of the regulations against 500, subject to a 90-day stay, as described in Part VI.

## V.

The parties agree that, if Table 2.A and § 6.6.1 of the regulations are found to be unconstitutional, 500's proposed entertainment would fall into the "Entertainment, restaurant, or recreation trade" category. 500 would then be permitted to open its proposed business either as a matter of right in a floating district or in a MU-LI zone subject to it obtaining a Special Permit. 500 therefore next asks the Court to determine whether the regulations, namely those regarding

approvals of floating districts and those regarding approvals of Special Permit applications, impose unconstitutional prior restraints, as both allegedly permit officials to exercise unbridled discretion and to impose additional standards.[4]

Both sides appear to agree that these regulations include prior restraints, as they "essentially require[] the permittee to obtain the government's permission or approval before engaging in an act of First Amendment protected speech." *Derusso v. City of Albany*, 205 F. Supp. 2d 16, 22 (N.D.N.Y. 2002) (quotation marks omitted); *see also Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999) ("The essence of prior restraints are that 'they give the public officials the power to deny use of a forum in advance of actual expression.'" (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (alterations omitted)). The parties' primary disputes are whether 500 has standing to bring a facial claim and whether the regulations are unconstitutionally broad.

The first question is quickly dispensed with: 500 may bring a facial claim without having first applied for a Special Permit. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988) ("[O]ur cases have long held that when a licensing statute *allegedly* vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." (emphasis added)); *see also id.* at 770 n.11 ("Facial attacks, by their nature, are not dependant on the facts surrounding any particular permit denial. Thus, waiting for an alleged abuse before considering a facial challenge would achieve nothing except to allow the

---

[4] Much of the case law on prior restraints is written in the context of challenged regulations regarding demonstrations. While much of the reasoning regarding official discretion is equally applicable to regulations of adult entertainment facilities, there is an inherent difference worth acknowledging between city ordinances that impose limitations on one-time performances or protests and those that impose limitations on would-be permanent businesses.

law to exist temporarily in a limbo of uncertainty and to risk censorship of free expression during the interim.").

The second question is considerably more complex. The Court must evaluate whether the regulations required for approval of floating districts and Special Permits, which have never been applied to adult businesses, are so vague that they "authorize[] or even encourage[] arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Generally, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51 (1969). "'The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.'" *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 493 (2d Cir. 2007) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). "'[R]egulations which *permit* the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'" *Id.* at 493-94 (quoting *Forsyth Cnty.*, 505 U.S. at 135) (emphasis in original). However, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,'" *Beal*, 184 F.3d at 126 (quoting *Rock Against Racism*, 491 U.S. at 794).

Encompassed within the prohibition on discretion is the concept that a municipality may not allow officials to impose arbitrary conditions at a later date. *See City of Lakewood*, 486 U.S. at 769-70, 772 (finding a law unconstitutional in part because that law authorized the granting of a permit subject to "such other terms and conditions deemed necessary and reasonable by the Mayor"). As in other contexts, "[w]ithout proper standards to apply, there exists a potential that

official discretion will be exercised to suppress a particular point of view." *Housing Works, Inc. v. Kerik*, 283 F.3d 471, 478-79 (2d Cir. 2002) (analyzing prior restraints with regard to noise requirements on protests).

500 brings facial claims against two types of regulations: those which govern the permitting requirements for floating districts, where "Entertainment, restaurant, or recreation trade" businesses are allowed as a matter of right, and those which require "Entertainment, restaurant, or recreation trade" businesses located in a MU-LI zone (or other similarly regulated zones) to apply for a Special Permit.

## A.

Live entertainment—which, given that this Court finds the regulations regarding adult entertainment facilities unconstitutional, will include adult entertainment facilities like those proposed by 500—is allowed as a matter of right only in a Mixed Use Waterfront ("MU-W") zone or in a Planned Development District ("PDD"). As noted above, however, both MU-W zones and PDDs are "floating districts"—that is, other eligible parcels must be re-zoned as such, then an applicant must obtain General Development Plan ("GDP") and Detailed Development Plan ("DDP") approval from the Commission. Such approvals are subject to the Commission's findings in §§ 14-5 and 14-6-4d of the regulations.

Section 14-5-5 notes that, in approving a GDP, the Commission "may impose such additional conditions on the proposed development[] as it deems necessary to conform to the requirements of Section 14-5-6, GDP Findings." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. F at 150. Section 14-5-6 includes six findings which the Commission must make before granting an application for a GDP. The Court finds three of these requirements particularly concerning. First, § 14-5-6-a requires that the Commission, before granting an application for a

GDP, find that the GDP is "compatible with the Bridgeport Master Plan." [5] *Id.* at 150. Second, § 14-5-6-c requires that the Commission find that the proposed GDP "promotes the public health, safety, and general welfare." *Id.* at 151. Third, § 14-5-6-e requires that the Commission find that the proposed GDP "promotes the economic well being of the city." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. F at 151.

Similarly, § 14-6-4-d of the regulations provides that, in "granting a DDP, a Zoning Enforcement Officer may impose such additional conditions on the proposed development, as the Officer deems necessary to conform to the requirements of Section 14-6-4c, Review and Disposition and Section 14-6-4-d-2, DDP Findings." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. G at 153. Section 14-6-4c is irrelevant to this case; Section 14-6-4-d-2 states in relevant part that the Zoning Enforcement Officer must find that any proposed DDP "complies with the general development standards set forth in the GDP"—presumably including those described in § 14-5-6. *Id.* at 153-54.

The Court is troubled by the fact that these regulations appear to permit the Commission to exercise unbridled discretion in imposing additional conditions and requirements for the approval of GDPs and DDPs. For example, § 14-5-6-a, read in conjunction with § 14-5-5, permits officials to impose additional conditions to ensure that a GDP (and, by extension, the related DDP) is "*compatible* with the Bridgeport Master Plan." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. F at 150-51 (emphasis added); *see also* Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. G at 153-54 (implicitly including this provision). Given the broad goals of the Master

---

[5] Neither party provided the Court with a complete copy of the Bridgeport Master Plan. However, the Court takes judicial notice of it, as provided on the City of Bridgeport's website. *See* City of Bridgeport, Master Plan of Conservation & Development, http://www.bridgeportct.gov/planningdepartment/pages/masterplan.aspx (last visited Mar. 27, 2012). The Bridgeport Master Plan, approved in 2008, lays out broad goals and policies for the city's development through 2020.

Plan and the varying interpretations of "compatible," it is impossible for this Court to determine conclusively what this provision permits. For example, whether a proposed use is "compatible" with the city's Master Plan might merely be a matter of applying certain requirements (such as how many businesses will be allowed per block)—or it may be allow for more of a "smell test" analysis whereby the Commission refuses to issue Special Permits to businesses it wants to discourage. *Compare Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (finding similar criteria unconstitutional because "[a]ll of them—individually and collectively—empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility'"), *with Lusk*, 475 F.3d at 494-95 (finding a "compatible" element constitutional, in part because it was more clearly defined as encompassing the "general design," "scale," "texture and materials," "visual compatibility," and "importance" of certain architectural features and in part because a certain level of subjectivity was necessary in a statute designed to regulate "non-speech, aesthetic endeavors"). The other subsections raise similar issues. *See* § 14-5-6-c, Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. F at 150; § 14-5-6-e, *id.* at 151.

## B.

Live entertainment is allowed as a matter of right, subject to the acquisition of a Special Permit, in almost every zone, including the MU-LI zone where 500's property is located.

The Special Permit section of the regulations, § 14-4 *et seq*., vests the Commission with the responsibility of deciding applications for Special Permits. Section 14-4-3 provides that "[i]n granting a Special Permit, the [Commission] may impose such additional conditions on the proposed development as it deems necessary to conform to the requirements of Section 14-4-4, Special Permit Standards." Pl.'s Local Rule 56(a) Statement [doc. # 49-1] Ex. E at 147. Section

14-4-4 lists nine standards upon which the Commission must base its decision. No permit may be granted unless the Commission finds that

1. the proposed uses "are compatible with and implement the objectives and policies of Bridgeport's Master Plan of Conservation and Development";
2. the proposed uses "will not impair the future development of the surrounding area";
3. the "height and bulk of buildings in the application proposal are consistent with the Master Plan and applicable Development Standards, internally compatible, and compatible with other structures in the vicinity and the character of the surrounding area";
4. "[t]he proposal includes adequate safeguards to protect adjacent property and the neighborhood in general from any detrimental impacts the proposed use might otherwise have";
5. "[a]ny environmental impacts to Long Island Sound are appropriately mitigated";
6. "both pedestrian and vehicular traffic to and from the use and assembly of persons in connection therewith will not be incongruous with residential uses, and will not present an undue hazard or inconvenience to residents" when the proposed special permit use is located in, or directly adjacent to, a residential district;
7. any proposed sign location will not block the view of a significant natural and local feature from the view of nearby residentially zoned properties;
8. the proposed use "will not tend to depreciate property values and character and extent of development of adjoining properties"; and
9. the proposed use "will not be disruptive to or cause conflicts with existing uses in the immediate vicinity."

*Id.* The parties agree that the Commission may exercise discretion in making findings required for a Special Permit in the granting or denial of an application; they disagree as to what amount of discretion is permissible.

The standards in § 14-4 include a mixture of concrete and vague requirements that may permit the Commission to exercise an inappropriate amount of discretion. As above, the "compatibility" term raises red flags. Other requirements, such as the requirement that an application not be disruptive or result in conflicts with existing uses, are similarly vague due to a lack of definition for terms that could be interpreted broadly or narrowly. Moreover, the requirement that the proposed use "will not tend to depreciate property values and character and extent of development of adjoining properties," *id.*, would seem to create a loophole as applied to

21

adult entertainment facilities: Bridgeport could claim that its regulations allow for the issuance of Special Permits to such facilities generally, while simultaneously permitting the Commission to deny each individual application. All in all, the Special Permit requirements are not unlike those in another case, in which a court found that the relevant regulations contained

> both detailed requirements germane to the determination of the suitability of a particular adult use business, and open-ended nebulous requirements which clearly bestow unlimited discretion to the Town Board, leaving open the possibility of content-based discrimination. . . . Furthermore, they are riddled with vague and essentially subjective requirements that fail to adequately advise applicants whether, and under what circumstances, they can engage in their constitutionally protected activities.

*B&V Greene Inc. v. City of Albany*, No. 99-CV-921, 2000 WL 1876426, at *5 (N.D.N.Y. Dec. 18, 2000) (quotation marks and citations omitted).

Furthermore, even were the text of § 14-4-4 not unconstitutionally vague on its own, it must be read in conjunction with § 14-4-3, which allows the Commission to "impose such additional conditions on the proposed development as it deems necessary to conform to the requirements of Section 14-4-4." *Id.* Insofar as it allows officials to impose additional conditions to ensure compliance with these subjective requirements, as written § 14-4-3 would seem to allow officials to impose additional, unbounded standards. *See City of Lakewood*, 486 U.S. at 769-70, 772.

C.

The Court's analysis may not, however, end at the observation that the text potentially permits an unconstitutional level of discretion, as a facial challenge should not be evaluated on the text of the statute alone: "When evaluating a First Amendment challenge of this sort, we may examine not only the text of the ordinance, but also any binding judicial or administrative construction of it. And we are permitted—indeed, required—to consider the well-established

practice of the authority enforcing the ordinance." *MacDonald v. Safir*, 206 F.3d 183, 191-93 (2d Cir. 2000) (finding the text of a statute unable to survive a facial challenge but refusing to grant an injunction because the record was incomplete with regard to past practices); *see also Beal*, 184 F.3d at 127 (finding a limiting construction "critical to the validity of the Rules on a facial challenge" and denying a request for an injunction on the basis that the record was not sufficient on this issue (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989))).

The parties agree that Bridgeport has not received—and therefore has not rejected—any applications from adult business facilities for floating districts or Special Permits in MU-LI or other previously forbidden zones. As a result, there is no evidence that officials impermissibly use discretion when evaluating applications from such facilities. However, there may well be extensive established judicial, administrative, or practice-based constructions of how the floating district or Special Permit regulations have been applied with regard to live entertainment facilities generally. Therefore, although the Court finds that both types of regulations include potentially troubling language, it ultimately concludes that there remains a question of fact as to how these regulations have been applied to other types of live entertainment facilities. As the appearance of unbridled discretion might be eliminated by constraining practice, *see MacDonald*, 206 F.3d at 191-93, and as no information about such practice is currently before the Court, summary judgment on this issue is denied.

## VI.

The Court GRANTS IN PART and DENIES IN PART 500's Motion for Partial Summary Judgment [doc. # 48]. Specifically, the Court finds as a matter of law that the requirements in § 6.6.1 and Table 2.A of the regulations were adopted without sufficient evidence of secondary effects and are therefore unconstitutional. The Court also finds that there remains a genuine issue

of material fact as to whether the regulations regarding the approval process for floating districts and Special Permits have been sufficiently constrained by well-established practice.

The Court recognizes that its decision in this case may have potentially disruptive effects for Bridgeport. In light of the complex constitutional issues and the interests at stake, as well as the possibility that part or all of its decision may be reversed on appeal, the Court believes a stay is appropriate. *See* Fed. R. Civ. P. 62(a) (noting that an injunction is not stayed "unless the court orders otherwise"); Fed. R. Civ. P. 62(c) ("While an appeal is pending from . . . [a] final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms . . . that secure the opposing party's rights."). The Court therefore stays the entry of its judgment for 90 days to provide the Commission with an opportunity to reevaluate and possibly readopt, after considering secondary effects, its regulations regarding adult entertainment facilities and/or to redraft its regulations regarding the approval process for floating districts and Special Permits.

In determining that a stay is appropriate, the Court has considered the factors laid down by the Second Circuit in *Hirschfeld v. Bd. of Elections*, 984 F.2d 35 (2d Cir. 1993): "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that might be affected." *Id.* at 39 (quotation marks omitted). The Second Circuit has also clarified that the required degree of likelihood of success on the merits varies according to the court's assessment of the other factors: "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply

stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir.

2002) (quotation marks and alteration omitted).

Bridgeport would not likely suffer an irreparable injury if no stay is issued; however,

neither will 500 suffer a substantial injury if a limited, 90-day stay is imposed. As 500's potential

injury associated with a limited stay is minimal, Bridgeport need not have a high likelihood of

success on appeal. Finally, while there is a strong public interest in protecting First Amendment

rights and enforcing the procedures which guarantee them, the Court also finds that there is also

a strong public interest in imposing procedurally-correct zoning regulations on adult

entertainment facilities. Accordingly, it is hereby

1. DECLARED that Bridgeport Zoning Regulations § 6.6.1 and Table 2.A are unconstitutional, as they were adopted without sufficient pre-enactment evidence and Bridgeport therefore has failed to demonstrate that they serve a substantial governmental interest; it is furthermore

2. ORDERED that, as of 90 days from the issuance of this decision, Bridgeport is enjoined from enforcing § 6.6.1 and Table 2.A of the Bridgeport Zoning Regulations against 500.

The Court anticipates that, based on this decision, the parties may wish to conduct additional

discovery regarding judicial, administrative, or practice-based constructions of how the floating

district or Special Permit regulations have been applied with regard to live entertainment

facilities. Therefore, the parties shall also submit a joint status report within 30 days of the entry

of this decision with recommendations as to how, and whether, the case should proceed with

regard to the remaining Counts.

IT IS SO ORDERED.


/s/     Mark R. Kravitz
        United States District Judge


Dated at New Haven, Connecticut: March 30, 2012.